***********
In accordance with the directives of the North Carolina Court of Appeals, the Full Commission has clarified its findings of fact and issues the following Opinion Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pre-trial agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. Plaintiffs' alleged dates of injury are shown on the Forms 33.
2. On those dates, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On those dates, an employer-employee relationship existed between the parties.
4. Sedgwick of the Carolinas, Inc. was the compensation carrier on the risk.
5. Judicial notice may be taken of all Industrial Commission forms on file.
6. Documents stipulated into evidence include the following:
 a. Stipulated Exhibit#1 — Medical records of the plaintiffs; and
 b. Stipulated Exhibit #2 — Industrial Commission Forms.
7. Plaintiffs' average weekly wages were to be determined by the Form 22's, which were prepared by defendants and included in the packets of Industrial Commission forms.
 *********** EVIDENTIARY RULINGS
1. The objections raised by Defendants at the depositions taken in this matter and at the hearing before the Deputy Commissioner are hereby OVERRULED.
2. Defendants' Motion in Limine on the admissibility of plaintiffs' proffered witness testimony and defendants' objections to the testimony of plaintiffs' treating physicians under the United State's Supreme Court's decision in Daubert v. Merrill Dow Industries, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny are hereby DENIED and OVERRULED. North Carolina law on the admissibility of expert testimony under Rule 702 of the North Carolina Rules of Evidence has coalesced in State v. Goode, 341 N.C. 513, 461 S.E.2d 631 (1995). Goode established a workable framework for ruling on the admissibility of expert testimony. Under North Carolina law, trial courts are vested with broad discretion to limit the *Page 3 
admissibility of expert testimony as necessitated by the demands of each case. Howerton v. Arai Helmet, Ltd., 358 N.C. 440, 597 S.E.2d 674
(2004). The Deputy Commissioner, having considered North Carolina case law, Rules of Evidence and the reliability of the witnesses' proffered testimony, allowed the introduction of this testimony. The Full Commission concurs, recognizing that the weight to be attributed to such testimony is a separate determination.
3. On June 28, 2005, the day of the hearing before the Full Commission, Defendants submitted a Motion for Additional Evidence to introduce correspondence dated July 7, 1994, from Power Vac Service, Inc. to Moore County Property management. Although Defendants stated that upon information and belief, they had supplied the correspondence to plaintiffs prior to the hearing before the Deputy Commissioner, it appears that the document was never included in the evidentiary record. Plaintiffs have objected to the late introduction of this document, which had not been authenticated or otherwise formally admitted into the record. Since plaintiffs were not afforded an opportunity to rebut this document, the Full Commission sustains plaintiffs' objections and the correspondence dated July 7, 1994, from Power Vac Service, Inc. to Moore County Property management is hereby excluded from the evidentiary record.
4. The testimony of Dr. Albert Robbins, D.O., and the opinions reflected therein are excluded from evidence, as they were not stipulated into the record. Further, Dr. Robbins did not submit to a deposition in which his opinions could be cross-examined or his records authenticated.
5. On February 20, 2009, Plaintiffs submitted a Motion to Take Judicial Notice of a portion of a report authored by one of their experts, Dr. William J. Meggs, together with certain colleagues. On February 25, 2009, Defendants submitted their Response and Objections to Plaintiffs' Motion. The materials submitted by Plaintiffs are the subject of dispute in the medical *Page 4 
and scientific communities as well as between the parties to this case. The Full Commission finds that the portion of the report submitted by Plaintiffs is not the sort of evidence of which the Industrial Commission should take judicial notice. Hayes v. Tractor SupplyCo., 170 N.C. App. 405, 612 S.E.2d 399, fn 1 (2005). See also N.C. Rule of Evidence 201. The Full Commission, in the exercise of its discretion, declines to take judicial notice of the materials submitted by the Plaintiffs and denies Plaintiffs' Motion.
 ***********
Based on the competent evidence of record, and in accordance with the directives of the North Carolina Court of Appeals, the Full Commission makes the following:
 FINDINGS OF FACT General Findings
1. All of the Plaintiffs in this case were employed by Moore County and each worked for some time in the Moore County Community Services Building (hereinafter "CSB").
2. Moore County purchased the CSB from Ren Electronics in the late 1980s and converted it into offices for county employees. It is a one-story structure constructed on a concrete slab. A septic system, which included three septic tanks, was buried under the building. Eventually the septic system was disconnected when the building was connected to the City of Carthage water and sewer system.
3. Budd Hill Shirer, a former employee of Ren Electronics worked in the subject-building from approximately 1980 to 1982. Mr. Shirer witnessed substances being poured down the drain in the CSB. Mr. Shirer was unable to identify every chemical improperly disposed of in this manner; however, he did specifically recall several, including trichlorethylene, toluene, methyl ethyl ketone [MEK] and other chemical solvent degreasing agents. Mr. Shirer did not *Page 5 
take part in the disposal of the chemicals nor could he give an opinion as to whether or not the chemicals persisted in the septic system up to the time Plaintiffs began working in the CSB. Mr. Shirer had no further knowledge of the business practices of Ren Electronics once he left his employment other than knowing that Ren Electronics ceased business completely at that location within two years of his departure.
4. On June 2, 1994, the Department of Health of Moore County received a telephone call regarding the air quality in the CSB. The concerns were that employees were suffering from fatigue, respiratory problems, eye irritation and other symptoms when occupying the CSB.
5. In response to those concerns, on June 7, 1994, Samuel W. Fields, an Environmental Health Section Supervisor, and Bobby Lake, a Moore County HVAC technician inspected the CSB. As a result of the inspection and follow-up air sampling, Mr. Fields recommended that provisions be made to provide for adequate fresh air intake into the air handling system. He recommended that several other changes be made on a cost effective basis for long-term air quality improvement. By June 20, 1994, the following measures had been completed in order to improve the indoor air quality: removal of condensate line from sewer vent and rerouting to outside per code requirements; additions of supply vents to offices, hallways and restrooms that did not have them; addition of return filter grills in hallways to facilitate regular filter changes; addition of fresh air intake louvers from outside; addition of fresh air intake filter box to filter outside air; and installation of new duct work to supply approximately 25% fresh air to each system.
6. On June 21, 1994, William Pate, an industrial hygiene consultant of the North Carolina Department of Environment, Health and Natural Resources, Division of Epidemiology, inspected the CSB. The inspection included a visual survey, employee interviews, *Page 6 
measurements of temperature and relative humidity and air sampling for carbon monoxide and carbon dioxide. Mr. Pate's inspection established that carbon dioxide concentrations were well below the acceptable limit of 1000 parts per million. In addition, air sampling did not detect carbon monoxide in the office part of the CSB but it was detected within acceptable levels in the garage area of the building. Temperature and relative humidity were also within the recommended ranges. Mr. Pate did not see anything during his inspection that would have caused him concern for the safety of the employees. The Full Commission finds that carbon dioxide and carbon monoxide were either not present in the CSB or were within acceptable levels. The Full Commission further finds that the temperature and humidity of the air in the CSB were within recommended ranges.
7. The employees at the CSB continued to have concerns about the air quality in the CSB. As a result, Moore County consulted with an environmental firm for more extensive testing of the CSB. On July 15, 1994, Phillip Boles, Director of Public Works, contacted Acurex Environmental and requested a walk-through inspection and indoor air quality assessment.
8. On July 20, 1994, Phillip Boles sent a memorandum to the managers of departments located in the CSB in which he confirmed that all test results in the building had been either negative or below levels of concern and all recommended corrective measures had been implemented. Mr. Boles outlined additional measures Moore County would take in an effort to address employee concerns. These measures included installation of operating windows to permit additional fresh air into the building; proper abandonment of three existing septic tanks on site which included pumping out the remaining contents and filling them with inert material; initiation of an independent evaluation from a private environmental engineering firm with experience in indoor air quality investigations; review of all Material Safety Data Sheets on *Page 7 
cleaning supplies, deodorants and construction materials used in the area; limiting the use of chemical cleaners and air fresheners; and continuing to monitor the indoor voltage transformer for possible emissions.
9. On July 19 and 20, 1994, at least one septic tank located at the building was drained and filled with sand.
10. Mr. William Pate, an industrial hygiene consultant of the North Carolina Department of Environment, Health, and Natural Resources, Division of Epidemiology, returned to the building on July 20, 1994, to conduct air sampling for residual pesticide concentration in the air and for volatile organic compounds. The test results of the pesticide concentration showed no detection of safrotin, dursban, chlordane, heptachlor or diazinon. The test results for volatile organic compounds were below the limits specified by the Occupational Safety and Health Administration ("OSHA") and the American Conference of Governmental Industrial Hygienists ("ACGIH") and may be related to the new paint, carpet, and vinyl flooring. These levels would decrease over time.
11. On July 27, 1994, Dr. Roy Fortmann and Russ Clayton of Acurex Environmental visited the CSB and met with Philip Boles, Sam Fields, and Bobby Lake to discuss the complaints and collect background information.
12. On August 2, 1994, peppermint oil was poured into the sewer line clean out and vents to determine if there were any leaks in the septic system. During the test, no peppermint odor was detected inside the building. Mr. Boles opined and the Full Commission finds as fact that the lack of peppermint odor established that there was positive pressure and that the sewer line was drawing air out of the building, not pushing it in. A similar experiment was conducted *Page 8 
with the three drain lines. Again, there was no peppermint odor, which established that there was no negative pressure that would have sucked the oil in through the slab.
13. On August 29, 1994, Acurex Environmental collected soil gas samples for the determination of volatile organic compounds; soil samples for the determination of heavy metals, sulfide, and cyanide; and air samples inside the building and outdoors for determination of volatile organic compounds.
14. On September 22, 1994, Acurex Environmental reported the testing results to Defendant-Employer. This report, submitted as one of Defendants' exhibits at the hearing before the Deputy Commissioner, revealed that there were limited volatile organic compounds ("VOC") detected in the outdoor air, which was not unexpected because the building site is a rural one with few sources of VOC's nearby. A number of VOC's were detected in the indoor air samples; however, these results were typical of those found routinely in office buildings. Further, the concentrations of VOC's detected in the building were within the range of concentrations measured in office buildings. Acurex Environmental's report stated, "the VOC's are unlikely to be a health problem for people occupying the building unless they are hypersensitive to volatile organic compounds." The Full Commission finds that the VOC levels detected in the testing discussed in this finding of fact were typical of indoor air in an office building.
15. Acurex Environmental collected 11 field soil gas samples from various locations around the building. Based on the results of the soil gas samples, Acurex Environmental's report stated, "it is unlikely that any of the 72 volatile organic compounds targeted for analysis occur at concentrations of concern in the soil near the locations where the samples were collected . . . The data suggest that the soil near the building is not contaminated with volatile organic *Page 9 
compounds." The Full Commission finds that the testing conducted by Acurex was accurate and credible. Therefore, the Full Commission finds that the soil near the CSB was not contaminated with volatile organic compounds.
16. Acurex Environmental also collected soil samples to assess the possibility that hazardous wastes may have been improperly disposed of in the area where the CSB was constructed. Although there were some low levels of various metals in the soil, Acurex Environmental's report stated, "The levels did not vary substantially between samples collected on the east, west, and north sides of the building. If the metals in the soil resulted from improper disposal of toxic wastes, we would not expect the concentrations to be uniform for the four samples. The data suggest that it is unlikely that there is surface soil contamination with heavy metals." The Full Commission finds that the testing conducted by Acurex was accurate and credible. Therefore, the Full Commission finds that the soil near the CSB was not contaminated with heavy metals.
17. In his deposition testimony, Roy Fortmann, Ph.D., a senior scientist in indoor air quality research at Acurex Environmental, testified that volatile organic compounds were detected in the indoor air samples, but the specific types of compounds identified and the concentrations were what would be considered "typical" of indoor air in an office building. None of the volatile organic compounds present in the air sampling were in excess of the limits of OSHA or ACIGH. The Full Commission finds Dr. Fortmann's testimony to be credible and persuasive. The Full Commission further finds that the air in the CSB during the time Plaintiffs worked there was typical of indoor air in an office building. *Page 10 
18. Acurex Environmental specifically tested for toluene, a substance identified by Mr. Shirer of Ren Electronics, and found it to be undetectable in the soil gas samples. Toluene was detected in the air sampling but at a rate below acceptable levels.
19. Acurex Environmental also tested for the presence of methyl ethyl ketone and trichioroethylene, other chemical compounds specifically identified by Mr. Shirer as having been dumped into the septic system by the employees of Ren Electronics. These chemical compounds were not detected in the testing.
20. Further testing of the soil occurred on September 9, 1994, when Flint Worrell, a waste management specialist from the North Carolina Department of Environment and Natural Resources, Hazardous Waste Section, obtained soil samples from within the actual trenches of the abandoned leach lines of the septic system. All of the chemical compounds tested for were either undetected or below the minimum detection level.
21. William Pate, an industrial hygiene consultant of the North Carolina Department of Environment, Health, and Natural Resources, Division of Epidemiology, reviewed Acurex Environmental's report and agreed with its conclusions and recommendations.
22. On November 9, 1994, William Pate wrote to Sam Fields of the Moore County Health Department stating that the previous investigations regarding the air quality in the CSB did not determine the cause of the building occupants' complaints but did offer recommendations for improving indoor air quality. Many of the recommendations had already been implemented.
23. On April 12, 1995, William Pate collected a sample of stained carpet, which he took to a laboratory for analysis. Testing indicated that a caffeinated drink had been spilled on the carpet. *Page 11 
24. On March 25, 1996, Flint Worrell, a waste management specialist from the North Carolina Department of Environment, Health and Natural Resources, conducted a sampling of two septic tanks and two soil samples from the area. The first sample consisted of soil and sludge taken from the bottom of the first septic tank. The second sample consisted of soil and sludge taken from the bottom of the third septic tank. The third sample consisted of soil collected five feet from the building in front of the exterior doorway and the fourth was taken approximately six feet from the building. Tests were conducted for heavy metals, volatile organic chemicals, and semi-volatile organic chemicals. It would be likely to find some amount of chemicals inside a septic tank. The testing revealed that the concentration of chemicals was below hazardous waste levels. Accordingly, since the testing did not reveal hazardous waste, the abandoned septic tanks were not required to be removed. The third septic tank had previously been pumped out and filled with sand and was, therefore, not tested by Mr. Worrell.
25. Mr. Philip Boles, Director of Public Works, made the decision to change the ceiling tiles and carpet, clean the windows and blinds and paint in order to err on the side of safety because of the length of time since the last refurbishment. None of the Plaintiffs made a request to Mr. Boles that samples be taken of the removed interior furnishings. Mr. Boles never refused to take samples nor did he have knowledge of anyone on his staff refusing to do so.
26. No volatile organic compounds or other toxic or pathogenic substances were ever detected in the CSB at a level in excess of OSHA's permissible exposure limits or the ACIGH's threshold limits value. The Full Commission finds that no volatile organic compounds or other toxic or pathogenic substances were present in the CSB during the relevant time period at a level in excess of OSHA's permissible exposure limits or the ACIGH's threshold limits value. *Page 12 
27. Bobby Lake, a Moore County HVAC technician, worked in the CSB but had no symptoms. He testified that, although the HVAC had been set up so that there was no fresh air intake, some amounts of outdoor air could get into the building through the doors. The Full Commission finds Mr. Lake's testimony credible and therefore finds that outdoor air could get in to the CSB through the doors. Mr. Lake never intentionally destroyed any materials which could be considered evidence in this matter.
28. David McNeill, the County Manager, prepared a list of the names of all persons who had worked in the CSB. This list included 37 Moore County employees, including Plaintiffs, Philip Boles, and Alison Melvin, Assistant County Manager. Mr. McNeill testified that none of the Plaintiffs ever personally requested that he maintain samples for testing of materials removed from the building. The Full Commission finds Mr. McNeill's testimony to be credible and further finds that none of the Plaintiffs requested that Mr. McNeill maintain samples for testing of materials removed from the CSB.
29. The Full Commission finds the testimony of Philip Boles, Bobby Lake, and David McNeill to be credible.
30. The Full Commission further finds that there is no credible evidence that Defendants spoliated evidence or materials which could later have been used as evidence in these claims. The Full Commission further finds that there is no credible evidence that Defendants intentionally destroyed evidence or materials related to the CSB which could later have been used as evidence in these claims.
31. None of the other 30 Moore County employees who worked in the CSB filed workers' compensation claims alleging any chemical, toxic, or other harmful exposure during their period of employment in the CSB. *Page 13 
32. Alison Melvin, Assistant County Manager, worked for the Planning Department in the CSB but never experienced any health problems that she attributed to the building. The Full Commission finds the testimony of Ms. Melvin to be credible.
33. Antex Exterminating had a contract for monthly pesticide applications in approximately 19 to 22 Moore County office buildings. The Antex contract with Moore County specified that either safrotin or boric acid aerosol were to be used indoors and diazinon could be used on the outside. Boric acid aerosols were not used and safrotin is approved by its manufacturer for use in offices, as well as in food handling establishments such as restaurants. Antex Exterminating used only one-half of the manufacturer's recommended concentration level in its spraying of the Moore County buildings.
34. There is no credible and persuasive expert testimony that establishes that Plaintiffs suffered from any health effects proximately caused by pesticide spraying at the CSB.
35. Dr. Fortmann of Acurex Environmental did not see anything during his inspection of the CSB that would have caused concern about the presence of a pathogenic substance and therefore he did not recommend testing for it.
36. The environmental testing performed does not support Plaintiffs' allegations that they were victims of chemical exposure or that they were subjected to a greater risk of developing an occupational disease than the general public during their employment in the CSB.
37. The competent and credible evidence of record fails to establish that there were toxic or pathogenic substances in the CSB at harmful or elevated levels. Therefore, since Plaintiffs were not subjected to an increased risk due to their employment with Defendant-employer, any diseases that Plaintiffs may have are not characteristic of and peculiar to their occupations. *Page 14 
 Findings for Individual Plaintiffs
38. At the time of the hearing before the Deputy Commissioner, Plaintiff Frances Huffman was a 41-year-old female who had received a high school diploma and paralegal degree. She lives on a farm with horses and began working for the planning department in the CSB in 1993.
39. Plaintiff Huffman claims that her first episode of sickness occurred when the insulation was being taken out of the ceiling. She claims that she experienced a choking sensation and felt as if she could not breathe. Plaintiff further claims that she has had similar episodes of bronchial spasms and swelling since ceasing to work at the CSB. Plaintiff takes prescription medication for severe asthma.
40. Dr. William Lee Bell, a family practitioner, began treating Plaintiff on March 4, 1996, for skin and respiratory complaints. Dr. Bell diagnosed Plaintiff with asthma and folliculitis, an inflammation of the hair follicles. Dr. Bell continued to treat Plaintiff until the time of the hearing before the Deputy Commissioner for symptoms of asthma, shortness of breath, fatigue, and various musculoskeletal-type complaints.
41. Dr. Bell opined that Plaintiff's symptoms could be related to the environment in the CSB but admitted that each and every symptom of multiple chemical sensitivity, chronic fatigue syndrome and fibromyalgia can be explained by some other illness, either psychological or physiological. Causes of fatigue other than chemical exposure could include post Epstein-Barr virus infection, metabolic abnormalities such as hypothyroidism, anemia, diabetes, chronic liver and kidney disease, malignant syndromes, depression, obesity, and sleep apnea.
42. On September 29, 1998, Plaintiff presented to Dr. Howard Jones of Occupational Health Systems in Winston-Salem, North Carolina. Dr. Jones' examination of Plaintiff was *Page 15 
unremarkable with the exception of hypertension. Dr. Jones opined that there was insufficient evidence to support a diagnosis other than an obstructive lung disease, such as recurrent bronchitis. The Industrial Commission finds Dr. Jones to be a credible witness and his expert opinions to be persuasive.
43. In his report, Dr. Jones stated, "there is a substantial debate in the scientific community regarding whether chronic fatigue syndrome or multiple chemical sensitivity syndrome are diagnosable entities per se, given that in many of these cases, substantial functional overlay exists." The Full Commission finds that there is a substantial debate over whether MCS is a diagnosable disease. As set out further in findings of fact 94 and 99, the Full Commission finds that a substantial majority of the medical and scientific community do not recognize multiple chemical sensitivities as a distinct clinical entity with a definable pathophysiologic basis.
44. On July 10, 1995, Plaintiff presented to Dr. Ted R. Kunstling, a pulmonary specialist. Dr. Kunstling was unable to state to a reasonable degree of medical certainty that Plaintiff has occupational asthma or occupational-related bronchial hyperactivities.
45. Dr. John B. Winfield, a professor at the University of North Carolina School of Medicine in the Department of Internal Medicine in the Division of Rheumatology and also in the Thurston Arthritis Research Center, has authored numerous articles on immunology. Defendants retained Dr. Winfield to review Plaintiffs' medical records and the reports of the experts for both Plaintiffs and Defendants. Dr. Winfield opined that Plaintiff Huffman's illness was not caused by environmental agents to which she may have been exposed while employed in the CSB since environmental testing never established toxic exposure. Dr. Winfield opined that factors other than environmental agents in the building, such as obesity, habitual inactivity, iron-deficiency *Page 16 
anemia and psychological variables are more likely causes of her symptoms. The Full Commission finds Dr. Winfield to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
46. Defendants retained Dr. Herman Staudenmayer, a psychologist with the Behavioral Medicine and Biofeedback Clinic in Denver, Colorado, to perform independent examinations and psychological testing of each of the Plaintiffs.
47. Plaintiff Huffman presented to Dr. Staudenmayer for an evaluation and psychological testing. After reviewing the Plaintiff's medical records and performing extensive testing, Dr. Staudenmayer determined that after Plaintiff became ill with infections and obstructive pulmonary illness, which did not resolve and for lack of resolution, she sought an explanation in the environment of the CSB. Dr. Staudenmayer concluded, to a reasonable degree of psychological certainty, that Plaintiff's complaints were psychogenic and not causally related to exposure to environmental agents during her employment in the CSB. The Full Commission finds Dr. Staudenmayer to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
48. At the time of the hearing before the Deputy Commissioner, Plaintiff Roger Kennedy was a 56-year-old male who had a general equivalency diploma and is a licensed plumbing and mechanical inspector in North Carolina. He began working for Defendant-employer in the CSB on February 4, 1990, as an electrical inspector. His job responsibilities required him to be in the CSB only two to three hours a day and the remainder of his work day was spent out of the building performing inspections. Plaintiff terminated his employment with *Page 17 
Defendant-Employer in February 1995 to work as the chief building inspector for the Town of Southern Pines. As of the hearing before the Deputy Commissioner, Plaintiff had not lost any wages due to his symptoms. Plaintiff has no personal knowledge of any toxic or pathogenic agents existing in the CSB.
49. On May 4, 2000, Plaintiff presented to Dr. Staudenmayer. Plaintiff told Dr. Staudenmayer that his job with Defendant-Employer was very stressful due to an alleged lack of qualified coworkers. Dr. Staudenmayer recalled that Plaintiff complained of extreme fatigue, lack of energy, and concentration problems, which improved after Plaintiff left his employment with Defendant-Employer. Dr. Staudenmayer opined that Plaintiff's complaints were psychogenic and not causally related to exposure to any environmental agents during his employment in the CSB. The Full Commission finds Dr. Staudenmayer to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which he may have been exposed in the CSB.
50. Dr. Winfield reviewed Plaintiff's medical records and answers to interrogatories and opined that Plaintiff's illness was not caused by environmental agents at the CSB because toxic exposure was not established at the CSB and it was more likely that other causes, including chronic job-related stress, obesity, and chronic lung disease were the cause of Plaintiff's symptoms. The Full Commission finds Dr. Winfield to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which he may have been exposed in the CSB.
51. At the time of the hearing before the Deputy Commissioner, Plaintiff Marilyn Dawn Kidd was a 48-year-old high school graduate who began working in the CSB in *Page 18 
approximately 1988 or 1989. Plaintiff claims that her symptoms included fatigue, poor concentration, dizziness, thirst and coughing. She also claims she suffered vertigo and nausea but admitted to taking medications that may have caused these symptoms. As of the summer of 1994, Plaintiff was no longer working in the CSB but as of the hearing before the Deputy Commissioner, Plaintiff testified that her symptoms persisted. In 1986, Plaintiff was examined at Pinehurst Surgical Clinic with complaints of left temporal pain, posterior cervical muscle spasm, itching in the ears, fullness around the eyes, and some intermittent dizziness. Plaintiff also began to take Xanax for depression in 1986.
52. Dr. Staudenmayer opined that Plaintiff uses denial and repression to project the cause of her distress onto environmental chemicals. In his opinion, Plaintiff's complaints are psychogenic and are not causally related to exposures to environmental agents during her employment in the CSB. The Full Commission finds Dr. Staudenmayer to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
53. Dr. Winfield also opined that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed during her employment with Defendant-Employer. Dr. Winfield bases his conclusion on the fact that a toxic exposure was not established; that even if Plaintiff has chronic fatigue syndrome or fibromyalgia, there was no accepted evidence in the medical literature that environmental exposures cause these diagnostic categories; and finally, factors other than environmental agents are the more likely cause of her symptoms. The Full Commission finds Dr. Winfield to be a credible witness and his expert *Page 19 
opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
54. Plaintiff has no personal knowledge regarding the presence of any toxic or pathogenic substances in the CSB.
55. At the time of the hearing before the Deputy Commissioner, Plaintiff Thomas Marsh was sixty-three years old. He is a college-educated man, licensed as a real estate broker and a certified zoning officer. Plaintiff worked in the CSB commencing in March 1993, although his job duties required him to be frequently out of the building.
56. Plaintiff claims that he experienced far-sightedness, dizziness, lethargy and swelling. He also claims that he has to "breathe deeper" than before.
57. On April 14, 1995, Plaintiff presented to Dr. Peter Bressler at Duke University Medical Center Department of Rheumatology, Allergy and Immunology. In his report submitted as an exhibit at the hearing before the Deputy Commissioner, Dr. Bressler concurred that Plaintiff had urticaria (hives) and angioedema (swelling/edema) but opined that it was unlikely that his work environment caused them.
58. In a letter dated May 12, 1995, Dr. Gordon Early, a Fellow at Duke Occupational and Environmental Medicine and Dr. Woodhall Stopford, Clinical Professor, Duke Division of Occupational and Environmental Medicine, stated that they could not find an agent to explain a workplace attribution for Plaintiff's illness. They further opined that urticaria and angioedema are diseases that are rarely triggered by a chemical exposure. Further, they stated that the previous three industrial hygiene evaluations failed to reveal significant chemical exposures at the CSB. Drs. Bressler, Early, and Stopford are treating physicians with no reason for bias and the Full Commission finds their opinions to be credible and persuasive. Therefore, the Full *Page 20 
Commission finds that Plaintiff's urticaria and angiodema were not caused by any environmental agents to which he may have been exposed in the CSB.
59. Dr. Staudenmayer opined that Plaintiff presented for evaluation without symptoms or overt signs of psychopathology. Dr. Staudenmayer testified that he found Plaintiff to have shown no evidence of memory impairment or dysfunction.
60. Dr. Staudenmayer opined that the most puzzling aspect of Plaintiff's case was his idiopathic edema, which Plaintiff identified as secondary to fatigue and not reliably triggered by odors.
61. Dr. Staudenmayer opined that Plaintiff's complaints are psychogenic and not causally related to exposures to environmental agents during his employment in the CSB. The Full Commission finds Dr. Staudenmayer to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which he may have been exposed in the CSB.
62. Dr. Winfield also opined that Plaintiff's illness was not caused by any environmental agents to which he may have been exposed during his employment with Defendant-Employer. Dr. Winfield bases his conclusion on the fact that a toxic exposure was not established and that factors other than environmental agents are the more likely cause of his symptoms. The only exception to this opinion was Mr. Marsh's angiodema and urticaria which, as usual for these common disorders, remain unexplained. The Full Commission finds Dr. Winfield to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which he may have been exposed in the CSB. *Page 21 
63. Plaintiff has no personal knowledge regarding the presence of any toxic or pathogenic substances in the CSB.
64. At the time of the hearing before the Deputy Commissioner, Plaintiff Frankie McCaskill was 62 years old. She began working for Defendant-employer in 1981 as a county planner.
65. Plaintiff claims that her symptoms included: blackness that formed behind her eyes like tunnel vision, mood swings, swelling from a size 7 to a size 16, nerve tingling, respiratory problems, fatigue, headaches, and dizziness. Plaintiff claims that she had little improvement in these symptoms when she was away from the CSB, or after the CSB was renovated, or even after she ceased employment at the CSB in 1994.
66. Plaintiff has been a smoker for over 38 years and, at one point, had smoked more than a pack a day. Plaintiff has no personal knowledge of any toxic or pathogenic agents existing in the CSB. Plaintiff contends that even after the renovation of the CSB, it still contained some type of hazardous substance that contributed to her health problems.
67. Plaintiff s medical records, submitted into evidence at the hearing before the Deputy Commissioner, revealed that in 1983, she had been treated for left upper extremity numbness; in 1988, Dr. Bell treated her for anterior tight chest pain and he noted that she had smoked a pack and one-half of cigarettes per day for 20 years; and that she had been under considerable stress due to working harder than usual in addition to taking care of her grandchildren. In 1989, medical treatment notes indicated Plaintiff had complaints of dizziness, fatigue, and vertigo.
68. On March 6 and 7, 1995, Plaintiff presented to C. Craig Farmer, M.A., for a psychological examination for the North Carolina Disability Determination Services. In his *Page 22 
report submitted into evidence at the hearing before the Deputy Commissioner, Mr. Farmer noted that his psychological testing did not reveal significant memory deficit and, in fact, showed that Plaintiff's memory was consistent with her intellectual abilities. Mr. Farmer opined that Plaintiff appeared to be "suffering from an agitated depression" and that she would benefit from supportive therapy to address her anxiety and depression. The Full Commission finds that prior to working at the CSB Plaintiff suffered from an agitated depression not caused by her employment with Defendant-Employer.
69. On September 14, 1995, Plaintiff presented to Dr. Donald E. Schmechel of the Duke University Medical Center's Memory Disorders Clinic. Regarding her symptoms, Dr. Schmechel opined, "it is [Plaintiff's] neuropsychological dysfunction rather than having suffered a true injury to her nervous system." The Full Commission finds that Plaintiff has no injury to her nervous system.
70. On March 9, 2000, Plaintiff presented to Dr. Staudenmayer for an independent psychological evaluation. Dr. Staudenmayer stated that Plaintiff has long standing obsessive compulsive and dependent personality disorders and that medical records show symptoms and treatment that predate the alleged exposures. He also noted that Plaintiff's belief in chemical sensitivity to "all chemicals" is not consistent with her behavior, e.g., she smokes and uses cosmetics which contain solvents. If Plaintiff were truly sensitive to all chemicals, smoking and using cosmetics containing solvents would cause Plaintiff to suffer symptoms. Plaintiff does not suffer symptoms when smoking and using cosmetics and, therefore, the Full Commission finds that Plaintiff is not sensitive to all chemicals.
71. Dr. Staudenmayer opined, with a reasonable degree of psychological certainty, that Plaintiff's complaints are psychogenic and are not causally related to exposures to *Page 23 
environmental agents during her employment in the CSB. The Full Commission finds Dr. Staudenmayer to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
72. Dr. Winfield also opined that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed during her employment with Defendant-employer. Dr. Winfield bases his conclusion on the fact that a toxic exposure was not established and that factors other than environmental agents are the more likely cause of her symptoms. The Full Commission finds Dr. Winfield to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
73. At the time of the hearing before the Deputy Commissioner, Plaintiff Sharon Scott was a 42-year-old high school graduate who was employed by Defendant-Employer in November 1984, and commenced working in the CSB in May 1990 as a recreation program coordinator for the Parks and Recreation Department.
74. Plaintiff claims that her symptoms included difficulty breathing, sinus infections, fatigue, fibromyalgia, chemical sensitivity, loss of sleep, cognitive difficulties and rashes. She claims that upon returning to the building twice after renovations, she started having trouble breathing again. Plaintiff contends that the building remained contaminated even after the renovations. However, Plaintiff has no personal knowledge of any toxic or pathogenic agents existing in the CSB. Plaintiff also claims that at the time of the commencement of her symptoms, she thought that she might have been suffering from leukemia. In 1984, she had *Page 24 
expressed concern that she had tuberculosis. Plaintiff was found to have neither of these illnesses.
75. On March 8, 2000, Dr. Herman Staudenmayer conducted an independent psychological evaluation of Plaintiff. In his report submitted as an exhibit at the hearing before the Deputy Commissioner, Dr. Staudenmayer opined that Plaintiff is a "hard driving woman with personality traits of obsessiveness and repressed hostility. . . . She also has identifiable traits associated with obsessive-compulsive personality disorder." Dr. Staudenmayer opined that to a reasonable degree of psychological certainty, Plaintiff s complaints are psychogenic and are not causally related to exposures to environmental agents during her employment in the CSB. The Full Commission finds Dr. Staudenmayer to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
76. In his report submitted as an exhibit at the hearing before the Deputy Commissioner, Dr. John Winfield opined with a reasonable degree of medical certainty that Plaintiff s illness was not caused by environmental agents to which she may have been exposed while working in the CSB.
77. Supporting his opinion, Dr. Winfield stated that a toxic exposure, including odors or chemicals absorbed by maps and documents was not established; opinions and speculation by certain health care providers are not supported by the facts in this case or by generally accepted information in the medical and scientific literature; Plaintiff has a clear history of anxiety with somatization in the setting of stress that antedates any environmental exposures in the CSB; even if Plaintiff has chronic fatigue syndrome and fibromyalgia, there is no accepted evidence in the medical literature that environmental exposure caused these diagnostic categories; and finally, *Page 25 
factors other than environmental agents in the CSB are the more likely cause of her symptoms. The Full Commission finds Dr. Winfield to be credible witness and his opinion testimony to be persuasive. The Full Commission further finds that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
78. At the time of the hearing before the Deputy Commissioner, Plaintiff Debbie Rogers was a fifty-year-old high school graduate. Plaintiff began working in the CSB in approximately January or February 1993. Plaintiff's testimony and medical records indicate that her main claimed symptom was extreme fatigue but she also experienced sinus infections. Even when Plaintiff was away from the building, her symptoms did not decrease.
79. Plaintiff's husband, with whom she lived for 24 years, was a chronic cigarette smoker. For many years, she was exposed to secondhand smoke that was never ruled out as a possible cause of her respiratory ailments and chronic rhinitis.
80. Plaintiff has no personal knowledge of any toxic or pathogenic agents existing in the CSB during the time she was worked there. The only substance that Plaintiff could identify with actual knowledge was the spraying of pesticides; however, she could not identify the specific pesticide or the concentration of chemicals.
81. On May 4, 2000, Plaintiff presented to Dr. Herman Staudenmayer for an independent psychological examination. In his report presented as an exhibit at the hearing before the Deputy Commissioner, Dr. Staudenmayer opined that Plaintiff showed symptoms of general anxiety disorder and that, to a reasonable degree of psychological certainty, Plaintiff's complaints are psychogenic and not causally related to exposures to environmental agents during her employment in the CSB. The Full Commission finds Dr. Staudenmayer to be a credible witness and his expert opinion testimony to be persuasive. The Full Commission further finds *Page 26 
that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
82. Dr. John Winfield reviewed Plaintiff's medical records and opined that Plaintiff's illness was not caused by environmental agents to which she may have been exposed while employed in the CSB since a toxic exposure was not established and the opinions of other doctors were not supported by the facts of the case or generally accepted information in medical and scientific literature. Further, since her illness was characterized principally by fatigue and during that time in her life, she had a number of severe chronic stressors, Dr. Winfield opined that more likely than not Plaintiff's fatigue was psychologically based. The Full Commission finds Dr. Winfield to be a credible witness and his opinion testimony to be persuasive. The Full Commission further find that Plaintiff's illness was not caused by any environmental agents to which she may have been exposed in the CSB.
83. Plaintiff presented to Dr. Bell, a family physician in Robbins, North Carolina, on three occasions with complaints including fatigue, shortness of breath, and depression. Dr. Bell diagnosed Plaintiff with chronic fatigue syndrome. This was a historical diagnosis based on Plaintiff s duration of symptoms and daily dysfunction of normal activities and Dr. Bell does not know the exact mechanism and pathophysiology of the illness. He further opined that Plaintiff's symptoms could be due to a mixed response of psychological and physical causes.
84. Dr. Robert Taylor, an otorhynolaryngologist, mainly working in the area ENT/allergy, examined Plaintiff on one occasion and therefore was unable to give an opinion on the causality of Plaintiff's complaints. However, he did opine that Plaintiff may have had sleep apnea and therefore would wake fatigued even after eight hours of sleep.
 General Medical Findings *Page 27 
85. Dr. William Bell is a family physician in Robbins, North Carolina, who examined and treated all Plaintiffs except Thomas Marsh.
86. Although Dr. Bell testified in his deposition that Plaintiffs' symptoms could be related to the environment in the CSB, he admitted that each and every symptom of multiple chemical sensitivity, chronic fatigue syndrome, and fibromyalgia can be explained by some other illness, either psychological or physiological. Dr. Bell is not familiar with the established criteria propounded by the Center for Disease Control on the diagnosis of chronic fatigue syndrome and had never seen any scientifically validated, peer reviewed journal articles on multiple chemical sensitivity. Dr. Bell also testified that chronic fatigue syndrome is a "rather nebulous area in medicine" and that the medical community is "not smart enough to quite figure it out yet."
87. Causes of fatigue other than chemical exposure could include post Epstein-Barr virus infection, metabolic abnormalities such as hypothyroidism, anemia, diabetes, chronic liver and kidney disease, malignant syndromes, depression, obesity, and sleep apnea.
88. Dr. Bell has no personal knowledge that any of the Plaintiffs were exposed to any toxic substance at levels in excess of the OSHA permissible exposure limits or other threshold limit values.
89. Dr. William Meggs, a faculty member at East Carolina University School of Medicine in Greenville, North Carolina, practices emergency medicine and toxicology at Pitt County Memorial Hospital. Dr. Meggs examined and performed rhinoscopies and nasal biopsies on all seven Plaintiffs. He noted some pathologic changes consistent with inflammation. Dr. Meggs never saw rhinoscopy or biopsy results for any of Plaintiffs prior to 1997 and does not know what their condition was prior to that time. Dr. Meggs admitted that there are many things that could cause the same sort of pathological findings of rhinitis. Dr. Meggs further testified *Page 28 
that cigarette smoke is an "absolutely undisputed" respiratory irritant. The Full Commission finds as fact that there are many things, other than an environmental agent at the CSB, which could have caused Plaintiffs' pathological findings of rhinitis. Dr. Meggs' testing did not rule out any of these other possibilities as the cause of Plaintiffs' findings of rhinitis. Further, the Full Commission finds that first and second hand cigarette smoke is a respiratory irritant.
90. Dr. Meggs is unfamiliar with the levels of potential irritants that would be commonly found in buildings throughout Moore County and was unable to provide any data about the average level of potential irritants that might be found in a building similar to the CSB.
91. A medical note of Dr. Meggs dated February 7, 1997, states, "A volatile organic chemical profile was done on September 8, 1994. The levels were found to be consistent with the levels seen in sick buildings." Dr. Meggs' note is not accurate. On August 29, 1994, Acurex Environmental collected soil gas samples for the determination of volatile organic compounds; soil samples for the determination of heavy metals, sulfide and cyanide; and air samples inside the building and outdoors for determination of volatile organic compounds. Acurex Environmental determined that the specific types of compounds identified and the concentrations were what would be considered "typical" of indoor air in an office building. In addition, none of the volatile organic compounds present in the air sampling were in excess of the limits of OSHA or ACIGH. On September 9, 1994, when Flint Worrell, a waste management specialist from the North Carolina Department of Environment and Natural Resources, Hazardous Waste Section, obtained soil samples from within the actual trenches of the abandoned leach lines of the septic system, he determined that all of the chemical compounds tested for were either undetected or below the minimum detection level. *Page 29 
92. Dr. Robert Taylor, who examined and treated Plaintiffs, Sharon Scott, Frances Huffman and Debbie Rogers, based his diagnoses on the history given to him by Plaintiffs. Dr. Taylor stated that "anything a patient tells you in the history is going to affect your baseline and affect how you are going to approach it."
93. Dr. Charles Lapp, an internist and a certified independent medical examiner, examined Plaintiffs Frances Huffman, Sharon Scott, and Marilyn Kidd. Dr. Lapp admitted that the diagnosis of multiple chemical sensitivity is not a scientifically valid diagnosis. Dr. Lapp based his opinions on a temporal and historical standpoint. Dr. Lapp stated that it was "well-accepted that we don't have a lot of data in this regard as to the exact cause of multiple chemical sensitivities" and that it is not yet scientifically proven and at the present time, it is an idiosyncratic condition caused by unexplained reasons.
94. Based on the testimony of Drs. Winfield and Staudenmayer, the evidence concerning the positions of the American Medical Association, the World Health Organization, the American Academy of Allergy, Asthma and Immunology, the American College of Occupational and Environmental Medicine, the American College of Physicians, and the International Society of Regulatory Toxicology and Pharmacy and the admission of Dr. Lapp, the Full Commission finds as fact that MCS is not a valid, scientific diagnosis supported by the majority of the medical and scientific communities.
95. Dr. Lapp admitted that any of the individual symptoms of multiple chemical sensitivity and chronic fatigue syndrome could be explained by some other disease process.
96. Dr. Lapp refused to give an opinion as to the effects of the alleged exposure to mold as he indicated that he was not aware of the alleged presence of mold in the building. *Page 30 
97. Dr. John B. Winfield is a professor at the University of North Carolina at Chapel Hill School of Medicine who is board certified in internal medicine and is board eligible in rheumatology. He is head of the Department of Internal Medicine, Division of Rheumatology and Immunology and is founder and director of the Thurston Arthritis Research Center for twenty years. At the time of his deposition submitted at the hearing before the Deputy Commissioner, he was conducting a study of 400 patients with fibromyalgia. In his opinion, the ongoing chronic stress and distress from almost purely psychological factors is at the heart of the physical illnesses exhibited by the Plaintiffs in this case. Dr. Winfield further opined that very likely Plaintiffs would have had the same symptoms whether or not they had worked in the CSB. The Full Commission finds Dr. Winfield to be a credible witness and his expert opinion testimony to be persuasive.
98. In his report submitted as an exhibit at the hearing before the Deputy Commissioner, Dr. Winfield stated, "scientific medicine does not accept the pseudoscience and speculation of illness and causation upon which the opinions of certain health professionals involved in [this case] have been based. Such opinions and attendant diagnostic evaluations and therapies have served rather more as iatrogenic perpetuators of the illness." The Full Commission finds as fact that the methodology employed by the Plaintiffs' experts, Drs. Lapp, Meggs, and Taylor does not comply with norms accepted by modern, scientific medicine and is instead speculative.
99. Dr. Winfield's May 31, 2000 report summarized his opinions regarding the illnesses ascribed by Plaintiffs to environmental exposures in the CSB, as well as the position statements of professional societies regarding multiple chemical sensitivities. These position statements reflect the opinions of expert medical and scientific committees who have reviewed *Page 31 
the world peer-reviewed literature in this area. The American Medical Association ("AMA"), World Health Organization, the College of Occupational and Environmental Medicine, the American College of Physicians and the International Society of Regulatory Toxicology and Pharmacology do not recognize multiple chemical sensitivities as a distinct clinical entity with a definable pathophysiologic basis and do not support the approaches to diagnosis, diagnostic impressions, and therapies applied to Plaintiffs.
100. Dr. Winfield concluded his report with the following statement:
 Based on my training and experience as an internist, rheumatologist, and immunologist with a special clinical and research interest in chronic fatigue syndrome, fibromyalgia and related syndromes, and after a careful review of the records provided to me, it is my opinion that environmental exposures in the Community Services Building did not cause illness other than relatively minor upper airway irritation during intermittent periods prior to renovations and repairs of the building in early Summer 1994. There is a high degree of probability that all other symptoms and illnesses of certain occupants that have been attributed to "sick building syndrome," including MCS, RUDS, fibromyalgia and chronic fatigue syndrome are psychologically and psychosocially based. The urticaria/angioedema exhibited by Mr. Marsh is unexplained, as is usual in such cases.
The Full Commission finds Dr. Winfield to be a credible witness and his expert opinions to be persuasive.
101. Dr. Herman Staudenmayer, a psychologist from the Behavioral Medicine and Biofeedback Clinic of Denver, conducted independent psychological evaluations on the seven Plaintiffs. Dr. Staudenmayer is a psychologist and head of the Behavioral Medicine and Biofeedback Clinic of Denver, Colorado. He conducted five years of study in experimentation on persons with chemical exposure and has been treating patients since 1980. Dr. Staudenmayer is also the author of Environmental Illness, Myth and Reality published in 1999. In 1996, he participated in the World Health Organization Conference on multiple chemical sensitivity. *Page 32 
102. Symptoms associated with buildings are categorized as building-related diseases or sick building syndrome. Building-related diseases are caused by identifiable contaminants of indoor air. Certain bacteria and molds commonly found in heating, ventilating and air conditioning (HVAC) systems can cause respiratory problems. To classify an outbreak as a building-related disease, there must be clear evidence that a causal agent is present in the building in the breathing zone of the building occupants. The disease must be a specific condition that can be observed and quantified, not simply a set of symptoms of general, multi-system complaints.
103. Dr. Staudenmayer opined that "to a high degree of psychological and scientific certainty, that psychological, psychological, and psychophysiological factors explain the symptoms of the seven claimants in this case of sick building syndrome." The Full Commission finds Dr. Staudenmayer to be a credible witness and his expert opinion testimony to be persuasive.
104. Dr. Staudenmayer opined that the scientific methodology used by Drs. Lapp, Meggs, and Taylor does not meet the standards of scientific validity and that those physicians basically relied solely on the complaints of the patients. As previously stated in Finding of Fact 98, the Full Commission finds as fact that the methodology employed by the Plaintiffs' experts, Drs. Lapp, Meggs and Taylor does not comply with norms accepted by modern, scientific medicine and is, instead, speculative.
105. Due to the expertise and knowledge of Drs. Winfield and Staudenmayer, including Dr. Winfield's training and experience as an internist, rheumatologist, and immunologist with a special clinical and research interest in chronic fatigue syndrome, fibromyalgia and related syndromes and Dr. Staudenmayer's lengthy career spent studying the *Page 33 
science of environmental illness and actual participation in the World Health Organization Conference on multiple chemical sensitivity, the Full Commission gives greater weight to their opinions regarding the causal connection between Plaintiffs' symptoms and the environmental condition of the CSB than to the opinions of Drs. Meggs, Lapp, Bell, and Taylor.
106. There is insufficient evidence regarding what, if any, exposure Plaintiffs may have had to chemicals, molds, or any other potentially toxic, harmful, or pathogenic matter while employed by Defendant-Employer, or that any alleged exposure aggravated any pre-existing condition. The medical and other evidence was insufficient to conclude that there is a causal connection between Plaintiffs' symptoms and their employment with Defendant-Employer.
107. Based on the greater weight of the evidence, Plaintiffs have not established that their symptoms were caused by or significantly aggravated by their employment with Defendant-Employer.
 ***********
Based on the foregoing stipulations and findings of fact, and in accordance with the directives of the North Carolina Court of Appeals, the Full Commission reaches the following: *Page 34 
 CONCLUSIONS OF LAW
1. A Plaintiff seeking compensation for an occupational disease under N.C. Gen. Stat. § 97-53(13) must establish that his disease or condition meets the following three criteria: (1) the condition is "characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged"; (2) the condition is "not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation"; and (3) there is "a causal connection between the disease and the [claimant's] employment."Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983)
2. In addition, Plaintiff must show that the employment significantly contributed to, or was a significant causal factor in, the disease's development. Hardin v. Motor Panels, Inc., 136 N.C. App. 351,524 S.E.2d 368 (2000). It must be shown factually that Plaintiffs' occupational exposure was such a significant factor in the development of the occupational disease that without it the disease would not have developed to such an extent that it caused physical disability that resulted in Plaintiffs' incapacity for work. Wilkins v. J P. Stevens Company, 333 N.C. 449, 426 S.E.2d 675 (1993).
3. Plaintiffs have failed to establish that they suffer from an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13) and therefore are not entitled to benefits under the Act. N.C. Gen. Stat. § 97-53.
4. Plaintiffs have not established an injury by accident. N.C. Gen. Stat. § 97-2(6).
 ***********
Based on the foregoing findings of fact and conclusions of law, and in accordance with the directives of the North Carolina Court of Appeals, the Full Commission enters the following: *Page 35 
 AWARD
1. Plaintiffs' claims are hereby DENIED.
2. Each side shall pay its own costs.
This the 14th day of April 2009.
S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1